# CHARLESTON

BARBOUR, STEDMAN AND HEROD *v.* TOMPKINS *et als.*

Submitted March 28, 1905.    Decided January 16, 1906.

1. EQUITY—*Decree—Conclusiveness.*

A decree that is appealable under clause 7 of section 1 of chapter 135 of the Code of 1899, as one adjudicating the principles of a cause, or that is final in such sense as to make it reviewable by bill of review, is conclusive of every matter decided by it, and of every matter which, by the rules of equity practice, the parties were bound to set up in reference to it, before submitting it for adjudication, and cannot be altered or disturbed except by appeal or bill of review, within the respective periods allowed therefor by the statutes. (p. 580.)

2. EQUITY—*Alteration After Term.*

After the expiration of the term at which such a decree was made and entered, it cannot be materially altered, by the court which pronounced it, as to anything so decided, or deemed in law to be ˋ

thereby concluded, except upon some proceeding instituted in said court for setting aside and annulling the same or correcting error therein.   (p. 580.)

3.   Equity—*Final Decree.*

After the expiration of the term at which such a decree has been pronounced, the same cannot be re-opened for the reception of pleadings, setting up defenses as to any matter so decided or concluded.   A defendant has no right of election to interpose his matters of defense singly and take separate successive trials and adjudications thereon.   By allowing a cause to be decided without having set up a defense, or any one or more of his defenses, he is deemed to have waived all matters so withheld.   (p. 582.)

4.   Final Decree—*Reversal.*

When this Court reverses a decree as to a matter finally determined thereby, and remands the cause with direction to enter a particular decree, as upon the merits of the subject-matter thereof, the mandate of this Court is final and conclusive upon all parties, as to all matters and things so directed, and no new defenses, existing and known at the date of the decree so reversed, can be entertained or heard in opposition thereto.   (p. 583.)

5.   Decree—*Liens—Priorities.*

A decree made in a suit brought to enforce the liens of judgments and a deed of trust, fixing the amounts and priorities of the liens, decreeing payment thereof, and directing a sale of the debtor's land, on default of payment, is final and conclusive as to the amounts of the debts, after the expiration of the term at which it is pronounced, and an answer praying the elimination of usury from one of the debts so adjudicated cannot be received thereafter.   (p. 583.)

6.   Equity—*Deed—Description—Evidence.*

When the other terms of the description in a deed are equivocal and uncertain as to the identity of the land, and the description by quantity, location and ownership, viewed in the light of admissible extraneous evidence, makes clear the intent of the grantor to convey only the land so described by quantity, location and ownership, the deed is not void for uncertainty, and will be given effect according to the manifest intent as gathered from the whole instrument. (p. 591.)

7.   Decree of Sale—*Condition Lease—Rents and Profits.*

If, after a decree of sale of real estate to satisfy liens thereon, a lease of part of the same for mining purposes, be executed by consent of all interested parties, but under an agreement that the execution of such lease shall not prejudice the right of any creditor to ask for sale of the land subject to the lease, and, by reason of development of the land under the lease, its market and rental values are largely increased, sale thereof will not be delayed for an inquiry as to whether its rents and profits will be sufficient to discharge the liens thereon within five years.   p. 593.)

Appeal from Circuit Court, Kanawha County.

Bill by Barbour, Stedman & Herod against William H. Tompkins and others. Decree for plaintiffs, and William H. Tompkins and H. P. Tompkins appeal.

*Affirmed.*

PRICE, SMITH & SPILMAN, for appellants.

MOLLOHAN, McCLINTIC & MATHEWS, for appellees.

POFFENBARGER, JUDGE :

By reference to page 410 of volume 31 of the Reports of this Court, it will be seen that the cause of Barbour, Stedman and Herod v. Wm. H. Thompkin and others was in this Court in the year 1888, on an appeal from a decree rendered in said cause on the 16th day of July, 1886, which said decree was reversed on account of errors specified in the opinion, and remanded to the circuit court of Kanawha county. Afterwards, on the 11th day of January, 1889, pursuant to the mandate of this Court, a new decree was made. For the correction of manifest errors of that decree, another was entered on the 16th day of April, 1891. Afterwards, two sales of the real estate of Wm. H. Tompkins were made under the decree as corrected. One of these, made April 12, 1894, for the sum of twenty thousand dollars, was subsequently set aside on account of inadequacy of price. The other, made on the 30th day of October, 1895, for the sum of seventeen thousand dollars, was also set aside on the same ground. On the 16th day of June, 1899, under an order of the court, four hundred acres of the land, situate on Kelly's Creek, was leased to J. D. Harris, acting for the Cedar Grove Colliery Company, for coal mining purposes, at a minimum royalty or rent of twenty-five hundred dollars per year, after the first two years. On April 30, 1902, Wm. H. Tompkins tendered, and was permitted to file, an answer in the nature of a cross-bill, praying, among other things, relief as to usurious interest provided for in the debt due from him to A. F. Mathews. Upon this answer, process was awarded and executed. Later, H. P. Tompkins, J. G. W. Tompkins and Ellen C. Tompkins also filed answers, praying affirmative relief. On the 19th day of November, 1902, A. F. Mathews, having excepted to the answer of Wm. H. Tompkins and given notice of a motion to strike out the

same, moved the court to strike from the record said answer and also the papers filed as answers of H. P. Tompkins, J. G. W. Tompkins and Ellen C. Tompkins. Upon these motions, the court adjudged that said papers should not be treated or regarded as answers, but, as they brought to the attention of the court matter calling for judicial action in the cause, they should be permitted to remain in the record as affidavits. By these affidavits, it was shown to the court that there was confusion and uncertainty as to what lands were subject to the lien for the debt due said A. F. Mathews, and, to ascertain and determine this question, the cause was referred to Joseph Ruffner, as special commissioner. On the 20th day of September, 1904, said special commissioner, having returned his report, a decree was pronounced declaring the lien for said debt to be limited to a certain portion of the land of said Tompkins, appointing George E. Price a special commissioner to act, in lieu of S. L. Flournoy, then deceased, with others who had been previously appointed, as special commissioner to make sale of the real estate, and directing such sale to be made unless the defendant, Wm. H. Tompkins, or some one for him, should pay off and discharge the liens on the lands with interest and cost of. the suit, within a certain time named. From this decree the defendants, Wm. H. Tompkins and H. P. Tompkins, have appealed, assigning, as grounds of error, the refusal of the court to allow the Mathews debt to be purged of its usury, and to refer the cause to a commissioner to ascertain whether the rents and royalties in the hands of the court, together with the rents, issues and profits of the lands, will discharge the liens thereon within five years. They also complain of a clause in the decree authorizing the commissioners to make a private sale of the land. Mathews has cross-assigned error because the court has held that this deed of trust does not include a certain tract of land upon which he claims a lien by virtue of it.

From the opinion delivered on the former appeal, as well as from the record, it appears that the debtor, Wm. H. Tompkins, did not prior to the rendition of the decree of July 16, 1886, object to the allowance of the usurious interest provided for by his contract, in such manner as to enable the court to expunge it. No relief in that respect was

subsequently asked by him until after the decrees of January 11, 1889, and April 16, 1891. His first attempt to object by way of answer or any pleading was made on April 30, 1902, long after these decrees had been entered. The question thus presented is whether, usury is such a matter of defense as the defendant was bound to plead before final decree, and whether these decrees are final so as to bar all matters of defense that were not set up before they were pronounced. For the appellants, it is said the right to have usury expunged is a defense exceptional in its nature and will be indulged by a court of equity under circumstances which would preclude the entertainment of other defenses, and also that these decrees are interlocutory and not final in the true sense of the terms.

Failure to sustain the first proposition would necessarily class this defense with all others. If, to be available in a court of equity, it must be pleaded as promptly as any other defense, and may be lost by failure to so claim the benefit thereof, the position of the appellants cannot be sustained unless the decrees are wanting in finality. There are some cases which are said to show that courts have been indulgent as to this defense. In *Ellzey* v. *Lane's Exrs.*, 4 Munf. 66, it was allowed after a decree by default, foreclosing a mortgage, and after the Supreme Court had reversed a decree, allowing a bill of review to be filed. The previous history of the case will be found in 2 Hen. & Munf. 589, and 4 Hen. & Munf. 504. Judge Tucker said, in 2 Hen. & Munf., page 592, that the bill had been taken for confessed and a decree of foreclosure made but not executed by sale. In 4 Hen. & Munf. the report of the decision of the superior court of chancery shows that, after the case went back, a *scire facias* was sued out to revive the suit, the plaintiff having died, and that the defendants set up usury in the contract as a defense on the *scire facias*, and the chancellor required as a condition to the granting of relief, payment by the defendants of the cost on the bill of review, in addition to the payment of the debt with legal interest thereon. The disposition of the appeal from this decree is reported in 4 Munf. page 66, and shows that the court held it erroneous to impose, as a condition of relief, the payment of the costs on the bill of review, and remanded the cause with directions to receive the plea.

*Fulton Bank* v. *Beach*, 1 Paige (N. Y.) 429, imports that after a decree by default a case may be re-opened for the purpose of allowing the defense of usury to be made. *Insurance Co.* v. *Sackett*, 11 Paige (N. Y.) 660, expressly so decides but says it will not be done except upon the condition that the defendant waives forfeiture of the debt, and only insists upon the defense of usury to the extent of usurious premium paid, or agreed to be paid. But, in all these cases it is expressly asserted that the applications for relief as to usury came before final decree. In 2 Hen. & Munf. the court expressly decided that the decree was not final, and, for this, Judge Tucker cited *Fairfax* v. *Muse's Exrs.*, 2 Hen. & Munf. 557, and *Boyer* v. *Lewis*, 1 Hen. & Munf. 553. His views are best set forth in his own language: "Considering the bill, in the present case, as a bill of review, properly so called, I am of opinion it was prematurely granted; a supplemental bill, in nature of a bill of review, is to be allowed only where *new matter* has been discovered since the decree; that is not the case here. The decree not being *final*, might have been altered upon a re-hearing, without the assistance of a *bill of review*; if there were sufficient matter to reverse it appearing upon the former proceedings." All the judges were of the same opinion. In 4 Munf. 66, on the second appeal in the case, Judge Roane said: "Although the statement made in the bill may possibly be explained so as to show the transaction not to have been usurious, yet, there being strong reasons from the statement to believe that the matter of the plea in the proceedings mentioned may be true, which defense, where it is probably correct, ought at all times to be received in a court of equity, (so long as the case is within the power of that court,) without annexing any unreasonable condition thereto, (such as that imposed on the offering the plea in this cause;) the said decree, as also that of the twentieth day of February, 1810, are erroneous." Just what he meant by saying "so long as the case is within the power of that court" would not be entirely clear without the aid of what the court had formerly held. It had formerly been decided that the decree was not final. He therefore clearly regarded it as an interlocutory decree, not precluding any proper defense which might be made before final decree. In *Insurance Co.* v. *Sackett*, there had been no decree, but.

only an order closing the proofs in the case. The status of *Fulton Bank* v. *Beach*, at the time the application for leave to examine the witness to prove usury was made, was exactly the same. And in the reasoning of the court upon this application it was said: "The power of the court to allow amendments, in furtherance of justice, at any time before a final decree, is unquestionable. They are always in the discretion of the court; but the exercise of that discretion must be governed by those general principles of equity by which the proceedings in this court are regulated." These cases are no authority for the position that this defense can be made after final decree. On the contrary, they are precedents, holding it proper to allow this defense to be interposed after a decree by default, but before final decree, and there is nothing in them to justify the assertion that the defense of usury is, in a court of equity, different from any other defense in respect to the time of its interposition.

As the law was deemed to be when *Lane* v. *Ellzey* was decided, these decrees would not have been considered final. But some years after the decision of that case, a radical change occurred in the views of the Virginia court, respecting the finality of decrees. In *Thorntons* v. *Fitzhugh*, 4 Leigh 209, Judge Tucker's views on that subject, which had previously been adhered to by the court, were departed from. Judges Carr and Brooke adopted a different view and decided the case accordingly, and Judge Tucker dissented. The decree appealed from was upon a bill by the daughter of a testator against a purchaser of his real estate and two sons of a deceased surety of the executor in his executorial bond, and the chancellor decreed that the sons should each pay to the plaintiff one-half of the annuities in arrear, and the costs of the suit, reserving liberty to the plaintiff, if the decree should prove unavailing against either, to resort to the court for a further decree against the other, and ordering the cause to be retained in court for the purpose of taking further action as to the annuities to accrue in the future. The executor had sold the real estate, wasted the personal property and died insolvent. The court held this decree to be final, notwithstanding the reservation in it. Judge Carr said: "It is well known that until 1798, there was no appeal from interlocutory decrees; the prior statutes gave them from final decrees

only. These laws did not define what should be taken as final decrees. The phrase was perfectly familiar to every student of the English law, and in the sense there settled, it was no doubt used by our legislature. We may then look to the English cases, to ascertain that sense. In England, no appeal could be taken except from final decrees. Yet do the books teem with cases, where the chancellor having at the hearing decreed upon the matters in controversy, an appeal is immediately taken to the house of lords, though various details are directed in execution of the decree, the cause retained, and leave given to the parties to apply to the court.'' Judge Brooke said: ''It is the settled principle of this court, that if the whole matter put in controversy by the pleadings is decided, the decree is final, and not interlocutory, although there are reservations embracing matters in execution of the decree, and although there may be a controversy growing out of the execution of it; as in the case of *Harvey* v. *Branson*, 1 Leigh 108. Nor is it of any consequence whether the whole matter in controversy is decided by the decree, negatively or affirmatively:—whether the errors, if any, are errors of omission or commission, they do not effect the character of the decree.'' In *Ruff* v. *Stark's Admx.*, 3 Grat. 134, the court held as follows: ''A decree which settles all matters in dispute in the cause, but omits to decree upon a claim set up in the bill, but which after-circumstances had rendered unimportant, and the plaintiff did not insist upon, is a final decree.'' In *Fleming* v. *Bowling*, 8 Grat. 292, the court held as follows: ''A decree which passes upon the whole subject in issue so as to be final in its nature, is not converted into an interlocutory decree by the addition thereto of an order suspending the decree as to the amount of an item of the account involved in the cause, until the decision of another suit brought by another party against both the plaintiffs and defendants in the first suit, in which the amount of the item is claimed by the plaintiff.''

In *Core* v. *Strickler*, 24 W. Va. 689, this Court interpreted the decisions above referred to and others, and came to the conclusion that ''A bill of review will lie to a decree in a creditor's suit, which ascertains the amounts and priorities of all the debts sought to be established in the cause as liens on real estate, and which orders said debts to be paid and the

sale of the real estate on which said debts are adjudged to be liens." There were two decrees in that case, one rendered in April, 1877, and another in May, 1880. One question was whether the decree of April, 1877, was final in the sense that a bill of review would lie to it. The decree fixed the amounts and priorities of the debts to be paid, adjudicated the payment of said debts and the cost of the suit and ordered the real estate to be sold for that purpose, and the court held that it was final in that sense. After quoting our statute relating to appeals, JUDGE SNYDER said: "In such cases it would, therefore, seem that a bill of review would lie as well as an appeal; but it is unnecessary to decide that question in this cause further than the particular decree under consideration requires such decision, and to that extent only is it now intended to intimate an opinion; for, certainly there are decrees from which an appeal would lie under the statute to which a bill of review would not lie." The Court in that case seems to have fully approved and adopted the definition and rule given in Story's Eq. Pl. section 480*a*, which reads as follows: "A bill of review also lies only after a final decree; for the court may, if the decree be only interlocutory, afterwards and before a final decree, vary or rescind it. But *a decree is final in the sense of the rule*, which finally adjudicates upon all the merits of the controversy, and leaves nothing further to be done but the execution of it. Thus, for example, a decree for foreclosure and *sale*, upon a bill brought by a mortgagee for a foreclosure and sale (according to the practice in many states in America), is final and the sale is but in the nature of an execution."

It seems to be the view of counsel for the appellant that a decree is not final as long as anything remains to be done by way of its execution, nor until the whole case is closed in every way and the cause dismissed from the docket. That was the view entertained by Judge Tucker, but which has been long since discarded. The uniform holdings of this Court has been that a matter in any cause that is so far settled and determined by a decree as to make it appealable, cannot be reviewed or altered by the lower court after the expiration of the term at which it was pronounced, except by a bill of review, for error apparent upon the face of the record, or for newly discovered evidence or mat-

ter, set up in the bill of review. The statute provides that certain decrees are appealable and that appeals therefrom must be taken within a certain time. This has been construed by the court as forbidding any alteration of the decree by an appeal after the expiration of the prescribed period. If we had no statute, limiting the right of review by bill of review, errors in such decrees could be corrected in the court below by bill of review at any time, but a statute imposes a limit. The object is merely to correct errors. In *Buster* v. *Holland*, 27 W. Va. 510, this Court held that an appealable decree cannot be altered, even for error apparent after the expiration of the time allowed by the statute for an appeal and for the filing of a bill of review: Point one of the syllabus reads as follows: "A decree ordering the sale of a defendant's land is an appealable decree under chapter 135, section 7, subdivision 7, of the Code, and therefore no error in such decree can be reviewed, unless the petition for the appeal was presented within five years after such decree was rendered (reduced now to two years by Acts of 1882, chapter 157, section 3, p. 506). Even though such decree was not a final decree, and a final decree was subsequently rendered, and an appeal was properly obtained from it, if the error in this final decree arose solely from errors in such decree of sale followed in the final decree." *Core* v. *Strickler*, is to the same effect. Upon ascertaining that the decree of April, 1887, in that case was an appealable decree, and such a decree as was cognizable upon a bill of review, the court determined that it was unalterable, on appeal, because the time for an appeal had passed and also the time within which a bill of review might have been filed. Numerous other cases decided by this Court declare the same principles. There is no exception to this rule. *Trail* v. *Trail*, 49 S. E. 431. Any decree which settles the principles of a cause is now appealable. But it must settle all the principles of the cause, leaving nothing to be done except subsidiary and sequential matters, necessary to the full execution of what is thereby decreed. *Wood* v. *Harmison*, 41 W. Va. 376; *Hill* v. *Cronin*, 56 W. Va. 174; *Shirey* v. *Musgrave*, 29 W. Va. 131; *Hill* v. *Als*, 27 W. Va. 215; Hogg's Eq. Proced. 648. That portion of the seventh clause of section 1 of chapter 135 of the Code, which allows an appeal from a decree adjudicat-

ing the principles of a cause, seems to be little more than a
declaration of what the court had previously held. The pur-
pose of this rule is to prevent frequent and successive appeals
in the same case, to the end that delay and confusion may be
avoided.

Under these decisions, any appealable decree, whether final
in all respects or not, is not subject to change after the expir-
ation of the term at which it is entered, except by appeal or
bill of review. As to all matters which have been carried
into it by the pleadings in the cause, it is as irrevocable and
inviolable, except in the manner aforesaid, as if it were the
last decree made in the cause, and retiring it from the docket.
*Trail* v. *Trail*, 49 S. E. 431; *Lehman* v. *Hinton*, 44 W. Va.
1. To be appealable, it must settle all the principles of the
cause, all the main controversies therein as above shown.
Does this mean only such matters as are shown by the plead-
ings, or every matter of defense which the nature of the
demand asserted called upon the defendant to interpose?
Has he a right of election as to the time at which his defenses
are to be put in, or must he bring them forward when the
cause is in such condition as to enable the plaintiff to call for
a decree adjudicating the principles of the cause? If defenses
may be withheld until after that time and then put in, and
new issues made, the decree would not settle all the principles.
It would always be in the power of the parties to re-open the
decree by bringing forward new matter by additional plead-
ings. We have decisions which say this cannot be done.
After a case has been made up and submitted and a decree
rendered in it, new pleadings cannot be filed. *Building
Association* v. *Westfall*, 47 S. E. 74; *Butler* v. *Thompson*,
52 W. Va. 311. A decree rendered upon a bill taken for
confessed is not open to any defense. *Ferrell* v. *Camden*,
50 W. Va. 119. If such right of election existed, some cases
would be drawn out to almost interminable length. Defenses
to a single demand are often numerous, and if they could be
put in singly and successive adjudications taken upon them,
great delay, confusion and cost would result. It would
be impossible to obtain a settlement of the principles of a
cause by a single decree. There would be trial after trial
and appeal after appeal as long as the list of defenses would

hold out. No such practice has ever been tolerated by this or any other court.

These decrees ascertained the amount of the Mathews debt. For that purpose there had been a reference. Upon that question, there had been a special hearing before decree. It was one of the questions expressly decided, and the part of the decree which fixed the amount was the subject of the former appeal in this cause. To say it can be re-opened and relitigated would be to ignore and set at defiance numerous decisions of this Court. If not final as to that matter, the decree was not appealable. This Court entertained an appeal from it thereby deciding it to be final. Being final, it could not be re-opened for new defenses.

The peculiarity and anomalous character of the rights of a debtor, respecting usury in a debt which he owes or usury which he has paid, are relied upon as important in determining the time at which it must be pleaded, and as warranting the reception of that defense after final decree, or until the cause is finally out of court in every way. Usury which has been paid may be recovered. A judgment for a usurious debt may be purged of the usurious interest in it upon a proper application to a court of equity for that purpose. In *Snyder* v. *Construction Co.*, 52 W. Va. 655, a doubt was expressed as to whether a judgment in an action at law could be purged of interest in the usurious contract, and *Hope v. Smith*, 10 Grat. 221, was cited in that connection. That case, however, does not seem to overrule the former cases so holding. It only decides that, after judgment in an action at law, it is too late to set up usury for the purpose of invalidating and defeating the whole judgment, under the statute declaring the whole debt forfeited as a penalty for having made the usurious contract. It does not touch the question whether, upon a proper application, the usurious interest included in the judgment may be eliminated. Assuming that a judgment at law does not preclude such elimination, what effect has that, or the right to recover back usurious interest which has been paid, upon the question now presented? What is the basis of jurisdiction in such cases? Merely the oppression and fraud which are presumed to enter into every usurious transaction. *Harper* v. *Building Association*, 55 W. Va. 149, 157; *Building Association* v. *McKnight*, 35

Pa. St. 472; *Moseley* v. *Brown*, 76 Va. 419, 425. For this, equity opens its doors to the borrower, and, to unearth and overthrow the violation of law, and relieve from duress and oppression, it has power to uncover every shift, device and scheme adopted by the parties for covering it up, including judgments of the law courts, suffered or acquired. Relief in equity as to the interest in excess of the legal rate is an independent right not lost or waived by failure to plead it at law. But when the parties are in the equity court, the forum in which such right must be asserted, when not interposed at law, the forum which has power to enforce discovery, give full relief and adequately protect the borrower, is there any excuse for longer withholding his defense? It is not perceived how these exceptions can have any bearing upon this question. The appellant has allowed a decree to be entered in a court of equity without having set up this defense. By the pleadings in the cause and presentation of the Mathews debt, an opportunity was given him to make defense. He was called upon to produce and insist upon any matters of defense which he had. The usurious character of the contract was apparent on the very face of the papers. The note provided for the payment of ten per cent. interest, payable annually. The proof was already in the record and it was only necessary for him to say he desired the usury to be cut out. He did not do so. Instead of doing so, he asked that the debt be reported with legal interest, but the commissioner reported it with the interest stipulated for in the contract, together with an alternative statement of it with legal interest. To his action, no exception was taken. This Court said he did not rely upon usury as a defense, because he had neither pleaded it nor excepted to the commissioner's report which audited the claim against him at ten per cent. Judge Johnson, delivering the opinion of the Court says: "If he had, in this instance, wished the defense interposed after the alternative statement had been made by the commissioner, and the commissioner ignored it, and reported the debt at ten *per cent.* because, as he supposed, the defense of usury was not in, then, certainly, he would have excepted to the report on the ground of usury, and because the commissioner did not adopt the alternative statement. He clearly did not intend to do this, as he excepted to the report on

other grounds, and not on this.   There is nothing here that approaches an exception to the commissioner's report on the ground of usury." Not having then elected not to pay it, nor since, until after another decree under the mandate of this Court, can he still elect to do so? Though usurious interest which has been paid can be cut out, does this argue that a final decree made after an opportunity to set up the defense in that forum in which it is looked upon most favorably, may be re-opened for its reception? True, it is only a matter of election, but so is the statute of limitation and the statute of frauds, where the proof appears in the record, as it does in many cases, but the benefit of these statutes must be claimed in some form.   It is not enough that the court may see that the party can make them available.   He must move in the matter.   These defenses may be less meritorious than that of usury.   It is a hardship to apply the statute of limitations or the statute of frauds against an honest demand, but it is not, in the eye of a court of equity, a hardship to compel the usurer to relinquish what the law does not allow him.   Yet, must not all meritorious defenses be asserted when the status of the case is such as calls for an election as to whether the party will or will not claim the benefit thereof? There is no authority for the position that the defense of usury stands, in this respect, different from any other defense, and the reason or ground of jurisdiction to relieve from usury is, as above shown, the same as underlies its jurisdiction in all cases of fraud, illegality and duress.

Having thus reached the conclusion that usury, as a defense, is not distinguishable from others in respect to the time at which it must be made in a court of equity, it follows that the decisions in *Lehman* v. *Hinton*, 44 W. Va. 1, and *Snyder* v. *Construction Co.*, 52 W. Va. 655, holding it barred by a decree fixing the amount of the debt, are sound and must be approved and followed in this case.   The defense of usury, therefore, is barred by the decree of this Court on the former appeal, remanding the cause with directions to enter a particular decree as well as by the later decrees made by the circuit court pursuant to the mandate of this Court.

The descriptive clause of the Mathews deed of trust which must be construed in determining whether a certain tract of

land containing six hundred and twenty-five acres is included, reads as follows:  "Also one other tract containing five hundred acres lying on the waters of Campbell's Creek; also one other tract containing about three hundred and fifty acres, lying near Kelly's Creek, and adjoining the lands of H. P. Tompkins, the last two tracts being parts of the John Steel survey of twenty-seven thousand acres (27000) and assigned to Wm. H. Tompkins in the partition deed of said 27000 acre survey, reference being had to said partition deed recorded in the clerk's office of the county court of Kanawha county for a more particular description of said tracts." When a deed in describing the land conveyed refers to another deed or map for further description, such other deed or map is considered as incorporated in the deed. *Snooks* v. *Winfield*, 52 W. Va. 441; 2 Dev. Deeds section 1020; *Davis* v. *Ramsford*, 17 Mass. 207; *Carpenter* v. *Millard*, 38 Vt. 9; *Bank* v. *Steward*, 93 Va. 447. The partition thus made part of the trust deed shows three lots were assigned to Wm. H. Tompkins out of the John Steel survey, one on Campbell's Creek containing 500 acres, called Lot P., one containing 1,675 acres, called Lot E., but not described as lying on Kelley's Creek; and one containing 2,280 acres, called Lot V., but not described as lying on Kelley's Creek, though said creek is mentioned in one of the calls in connection with a monument. In both Lot E. and Lot V. mention is made of Witchers Creek.   Neither of these lots is there described as adjoining the lands of H. P. Tompkins, but they adjoin each other.

Extraneous evidence in the record discloses the following facts: Wm. H. Tompkins in 1881 applied to Mr. Alexander F. Mathews for a loan, and agreed to give a deed of trust on his lands; here there seems to be some dispute, Mr. Mathews claiming that Tompkins was to give a trust deed on *all* of his lands and Mr. Tompkins denying this, saying that nothing was said as to *all* of his lands. At any rate, Mr. Tompkins took to Mr. Mathews from W. A. Quarrier, a statement which purported to show the lands owned by Mr. Tompkins in Kanawha county, and among others was a tract of three hundred and fifty acres on Kelley's Creek. Mr. Mathews made the loan and Tompkins executed the deed of trust. (Mr. Quarrier, at the time, in the statement he made,

said that Mr. Tomkpins' title to the tract of land he knew to be good.) There had been assigned to Tompkins out of the Steel survey prior to this, two tracts of land, one of 1,675 acres, Lot E, and one of 2,280 acres, Lot V, that these lots adjoined and that Tompkins' interest in the Steel survey was put in two lots, because the boundaries of the Steel survey were in dispute. In other words, there were 1,675 acres, the title of which was known to be good, as the location of the Steel line did not affect this, and 2,280 acres was in dispute, it being uncertain whether Tompkins would get any part of this 2,280 acres or not when the Steel line was properly located. After this was so assigned to Tompkins and before the trust deed was made, Tompkins sold and conveyed about 1,500 acres of Lot E to Mr. Bowers. Thus leaving Tompkins, at the time the trust deed was made, the residue of Lot E, after taking out what he had sold Bowers and all of Lot V. After he had sold part of Lot E to Bowers and before the trust deed was made, to-wit, in 1877, Tompkins had Sylvester Chapman, surveyor, to run off and survey the lands that he had remaining in Lot E, which had not been sold by him to Bowers, and Chapman found by an actual survey that he, Tompkins, still owned of Lot E, 349 acres. The survey made by Chapman of this 349 acres is filed with Tompkins' affidavit. This 349 acres was all the land that Tompkins knew he owned lying on Kelley's Creek in 1881, the time of the execution of the trust deed. After the execution of the trust deed, in the year 1888 or 1889, the line of the Steel survey was settled and it was then ascertained that Tompkins, out of Lot V, got, instead of 2,280 acres, 625 acres of land, which adjoined the 349 acres that had been surveyed by Chapman. Both Lot E and Lot V are on or near Kelley's Creek and adjoin the lands of H. P. Tompkins.

By the aid of this evidence, the circuit court reached the conclusion that the clause of the trust deed in question covers only the 349 acre tract, constituting the residue of Lot E, and does not include the 625 acre tract, saved by Mr. Tompkins out of Lot V. Mr. Jos. E. Chilton, acting as special judge, passed upon the question, and, in so doing, delivered an opinion, which he reduced to writing, and which reads, in part, as follows:

"In determining this question, the following principles for the construction of the deed must be recognized and applied:

"First, 'The deed is to be construed with reference to the actual state of the property at the time of its execution and the law assumes that the parties refer to this for a definition of the terms made use of in their deed.' Amer. Enc. of Law, Vol. 4, page 79; 79 Amer. Decision, 767.

"Second, 'The description will be construed, if possible, so that no part of it will be rejected or rendered inoperative.' Amer. Enc. of Law, page 798.

"Third, 'If there is any land wherein some of the demonstrations are true and some false, only those lands shall pass wherein the demonstrations are true, or, in other words, where the grantor in a deed owns lands which comply with all the particulars of the description, the deed passes title to those lands only, although it may appear that the grantor intended other premises to pass also, which were included within only a part of the description.' Amer. Enc. of Law, Vol. 4, page 794.

"Fourth, 'In describing land, quantity controls where other parts of the description are not sufficiently certain in defining the parcel of land intended to be conveyed.' Amer. Enc. of Law, Vol. 4, page 794.

"The actual condition of the property at the time the trust deed was made, was that Tompkins had a tract of about 350 acres lying on Kelley's Creek, which was shown by the Chapman survey in 1877, to which he then knew he had good title, and that to the 625 acres which he now owns, he did not at the time know that his title was good. Must we not then believe that in drafting this trust deed, the draftsman, whoever, he was, had in mind some tract of land of about 350 acres and intended to cover only this tract? Can we believe that the draftsman referred to the 2,280 acre tract as a 350 acre tract or even a 975 acre tract as about 350 acres? The actual condition of the property at the time the trust deed was made shows that the lands to which Tompkins had title then, corresponds in acreage and description exactly with the tract of land mentioned in the trust deed. If we take every part of this description, the acreage, the

location, and give every part its due weight, and treat the property as it then actually was, have we not a fixed tract of land that must have been contemplated in this trust deed, to-wit, 349 acres as surveyed by Chapman and shown by the Chapman survey. To disregard this call for acreage and say that it was a mere guess and that this call referred to Tompkins' entire holdings on Kelley's Creek, which were then as liable to be 3,000 acres as it turned out afterwards to be 975 acres, would be to disregard a part of the description which corresponds with the condition of the land as it then actually existed. You will also have to render inoperative the call for acreage as given and presume that the draftsman of the trust deed had no knowledge whatever of the condition of the property and meant the number of acres as in no way descriptive of the property contained in the trust deed. When you apply the law to the undisputed facts in the case, it does not seem that there can be any question as to what tract of land was in the mind of the draftsman of the trust deed. The acreage that he gives corresponds with the only tract of land that Tompkins then knew he owned and acreage controls where other parts of the description are insufficient to determine the parcel of land intended to be conveyed. It is not seen how this call in the trust deed can be extended so as to include any other than the 350 acres. The circumstances under which the deed was made and the condition of the property at that time, if any effect is to be given to the terms in the description, must fix this description to this tract of land, to-wit, a tract of about 350 acres, situate on Kelleys Creek, adjoining the lands of H. P. Tompkins, and which was assigned to him out of the Steel Survey. The boundary of this tract of land was well known, it had been surveyed. Under what rule of law or what authority can you disregard this call of acreage and say that the draftsman of the deed had any other land in view? It must be remembered in construing this call in the trust deed, we are not determining what Mr. Tompkins would have done had Mr. Mathews known all the facts about these lands. The question is not whether Tompkins would have included such land as he might have owned in Lot V in the trust deed had Mathews known about his claim and demanded it, but it is, 'Did he so include it at the time

the trust deed was executed?' And in looking at the call of the trust deed in view of the actual condition of the property at that time, we must find that to include any land outside of the 350 acres would be to disregard the very terms of the trust deed and would be taking parol evidence to *contradict* the very terms of the deed instead of to *explain it.*"

The strongest criticism made upon this position is, that, so construed, the deed becomes void for uncertainty, unless saved by the adjudications of its validity already made, and courts will never so construe a deed if such result can be avoided. In this view we do not concur. Under the descriptions of two tracts, containing, respectively, five hundred acres and three hundred and fifty acres, assigned by partition out of the Steel Survey, the partition deed is referred to for greater particularity of description. Reference to it discloses that there were three such tracts, not two. One of them corresponds with the five hundred acre tract mentioned in the deed of trust, in all respects. The posititon of counsel for appellee would make the other two pass under a call for one tract, because the trust deed says the land thereby conveyed had been assigned out of the John Steel survey. It does not say it conveys all the land so assigned. It does not describe the three hundred and fifty acre tract by metes and bounds, nor, by the reference made, does it furnish means of description of any such tract, otherwise than by the acreage thereof, and the location, namely, "near Kelleys Creek and adjoining the lands of H. P. Tompkins." As the description by metes and bounds, found in the partition deed, when read into the trust deed, furnishes means of identifying two tracts instead of one, thereby conflicting with antecedent terms of the trust deed, a doubt is created as to what the exact intention was, though the intent to pass something out of the land assigned from the Steel Survey, and lying near Kelley's Creek, is clearly and unequivocally disclosed. If there were nothing in the deed by which this doubt could be resolved and reasonable certainty attained, without saying the whole of the land so assigned, both of these tracts as well as the five hundred acre tract, should pass, we might hold, under two rules of construction, "*Ut res magis valeat quam pereat,*" that the thing shall avail rather than perish, and, in case of doubt, a deed

shall be taken most strongly against the grantor that all the land assigned passed. But there is descriptive language by which a thing corresponding to it perfectly can be found, the desription by quantity and location. Mr. Tompkins owned just such a tract as is described thereby, and all the other descriptive language used relates to it. All the language of a deed shall have some effect if possible, but every word and clause need not, and cannot, have effect according to its literal terms, if contrary to the intent plainly disclosed by the instrument viewed as a whole. A deed is not void for uncertainty, if, from the description given in it, the property can be located. This deed clearly grants a three hundred and fifty acre tract near Kelley's Creek, and adjoining the lands of H. P. Thompkins, if the grantor owned such a tract, unless the description by quantity must be rejected. Usually, it does not control a description by metes and bounds, but sometimes it does. When? "When the other terms of the description are not sufficiently certain, the number of acres specified may be an essential part of the description." Dev. Deeds § 1045. "Where the description of tracts of land by monuments, distances or otherwise, is vague and indefinite, by reason of conflicting lines, or by the omission of a line, *or from any other cause*, a statement of the acreage is an essential part of the description." *Hostetter* v. *Railway Co.*, 108 Cal. 38. In the case just quoted from, and others therein referred to, the principle was applied in locating a disputed boundary line. But it would seem to be more clearly applicable, when the question is the identity of the land granted, and the quantity, with other descriptive matter, points unerringly to a particular tract. The question here is not whether anything passes, but what passes, under this deed. Under either construction contended for, there is no lack of certainty, and the controversy is simply as to which construction shall prevail. All authority answers, that one which accords with the manifest intention of the parties gathered from the whole instrument. "Where a deed contains a particular description of the property the fact that it contains a statement that the granted premises are the same that were conveyed to the grantor by a certain deed does not render it conclusive that it was the intention of the grantor to convey all of the premises included in the latter deed." 13 Cyc. 633.

This deed does not say the same land that was assigned, nor all that was assigned. After a careful examination of the opinion, filed by the special judge, above referred to, and the authorities, we are convinced of the correctness of his conclusion, as to this point.

But it is urged that this conclusion is precluded by the conduct of the appellant. In our judgment, Judge Chilton's opinion conclusively answers this contention also. He says: "The only action of Tompkins referred to is his sending a map to Mr. Mathews with nine hundred marked on it. Mr. Mathews understood this nine hundred to include the lands owned by Tompkins on Kelleys Creek. It must be remembered that this map was sent to Mr. Mathews some ten or fifteen years ago. At that time the Steel Survey was settled and Mr. Tompkins knew what lands he owned; and for many reasons, as can be seen, Mr. Tompkins may have then told Mr. Mathews that he owned nine hundred acres on Kelleys Creek, without meaning to say to him his trust deed embraced them all. It is claimed further that the action of Mr. Tompkins in not raising the question earlier in this suit shows that he construed the trust to cover all of his Kelleys Creek land. This position is not tenable from the fact that at no time in this suit has the question, as to the lands involved in this deed of trust, been raised so as to call on Mr. Tompkins to give his understanding of the trust deed. The only question raised in reference to the lands in the suit, has been the different views taken by the special commissioners as to what was embraced in the trust deed. Without going into the several advertisements showing the views of the different special commissioners, it is sufficient to say that they have all differed, and the different opinions of the several special commissioners appointed to make the sale, whether such opinions were arrived at hurriedly or after consideration, are sufficient to show that there has always been a question as to what lands the trust deed embraced, and that this has been an unsettled question. The views of the different special commissioners, had they all agreed on one point, might be advisory as showing what they thought of this trust deed, but it certainly could not bind any party interested in the case to a *construction* of the trust deed.

It is true that in several affidavits filed by Mr. Tompkins

he refers to the Kelleys Creek land as one tract of about nine hundred acres, but all these affidavits were after the Steel Survey was settled and Tompkins then regarded his Kelleys Creek land as one tract and the object of these affidavits was to set aside a sale which would of necessity embrace all his lands, whether included in the trust deed or not.   What reason then could there be in making these affidavits to separate the lands embraced in the trust deed from the others?   I cannot see how affidavits made at the time and for the purpose as were those made by Mr. Tompkins, could in fairness to him be treated as in any way throwing any light on the lands that he regarded as embraced in the trust deed.

The only paper filed in the case that recites the lands embraced in the trust deed is a bill prepared by Bowers for an injunction.   This bill is made an exhibit with a petition filed in the case of Bowers.   The object of this petition is to modify the decree of sale formerly made so that a tract of one hundred and five acres of land that had been sold Bowers by Tompkins would not be sold until after the other lands had been sold.   I think it will be seen that so far as affects the prayer of this petition of Bowers, it was immaterial whether the statement in the exhibit filed with said petition, that the nine hundred and twenty acres on Kelleys Creek was described in the trust deed as a tract of three hundred and fifty acres, etc., was true or not.   Whether this was true or false, Bowers, it would seem, was entitled to the prayer of his petition.   Then why would any one be called to deny these allegations even though they were not true?"

Appellant, Wm. H. Tompkins, further complains of the refusal of the court to refer the cause to a commissioner, to ascertain whether the rents and profits of the land will discharge the liens thereon within five years.   He has had the benefit of one such reference and an adverse finding, but that occurred many years ago, and a great change in the value of the property has since taken place.   This grows largely out of the development of the property under the mining lease, given upon part of it by consent of all parties to this cause.   Of course, there has been a large appreciation in the value of all lands in the community, but the fact principally relied upon as ground for this request is the development of the

property under the lease.  The order confirming the lease, contains the following adjudications:

"And by like consent it is further adjudged ordered and decreed that the entering of this decree shall not prejudice or affect the rights of the creditors of the defendant Wm. H. Tompkins to ask for a sale or sales in the above entitled cause for the satisfaction of their respective debts, but whenever the real estate of the said defendant Wm. H. Tompkins embraced in said lease is decreed to be sold, if the lease thereof by this decree authorized to be made is in existence and unforfeited such sale or sales shall be made subject thereto.

"And by and with like consent it is further adjudged, ordered and decreed that the entering of this decree shall not disturb or in any wise affect the present *position,* standing or priority of any of the creditors of any of the defendants in the above entitled cause, nor shall such decree operate to release any surety upon any debt sought to be collected in said suit, *or in any wise prejudice or affect* the present rights of creditors against any defendants in said suit whether as principals or sureties either in said suit or in any other proceedings now pending or hereafter brought."  This was subsequent to the decree of sale.  Nothing remained to be done, so far as any person then knew, but the execution thereof, by the commissioners appointed for the purpose, at the request of the creditors.  We regard the consent of the appellant, above expressed and adjudicated, as conclusive upon any right which he might otherwise have had to invoke any discretionary power which the court has, if any, to further delay the sale for his benefit.

It is also urged that the court erred, in the decree of sale, in clothing the commissioners with authority to make a private sale of the lands with the consent of the appellant, Wm. H. Tompkins.  H. P. Tompkins, whose consent to such sale is not required by the decree, also assigns this as ground of error.  As the decree was made several years ago, and the time within which it might have been appealed from has long since passed, no relief could now be afforded, if we were convinced of the existence of error in that respect.  As hereinbefore shown, the decree was, as to such matter, final

and unalterable, except by appeal or bill of review, within the time allowed for such proceedings.

There being no error in the decree, it must be affirmed.

*Affirmed.*

BRANNON, JUDGE:

I am satisfied with the decision, except that I am inclined to think that the deed of trust of Mathews covers the nine hundred and twenty acres, all the balance of the land of Tompkins assigned to the defendant except the five hundred acres. It does not cover merely the three hundred and fifty acres, but nine hundred and twenty acres. I express no opinion as to whether a judgment can be relieved against by equity for usury, where the usury appears on the note, or was known before judgment, and no discovery was needed.