Opinion of the court, by
Judge Collet :
The question first to be determined is, are the deeds of Chris* topher Myers to his sons and sons-in-law fraudulent as to the demand of Brice.
A person is trusted or obtains credit in proportion to the property he appears to own ; the creditor, when he trusts him, looks to his possessions as evidence of his ability to pay, and as a fund' from which, if other resources of the debtor fail, he is to receive his demand. After the credit is obtained, for the debtor to divest himself of his property by giving it away, thereby rendering him. self unable to pay his debt, or to perform his contract, is unjust; it is a fraud upon his creditor. Whether, by making the gift, ther *110 ■debtor intended to prevent the payment of the debt or not, can make no difference as to the rights of the creditor; his injury is the same. *It is the duty of the debtor to retain at least a sufficiency of his property to pay all his debts, and perform all his ■ contracts ; if he doe's not, justice requires that the property should be followed into the hands of the donee by the creditor. He who combines with a debtor to defraud his creditor, by buying his ■property, even at a full price, and receiving a conveyance of it, ■does a wrong to the creditor for which he should answer by having the property subjected to the creditor’s demand. He who gives or sells property, and remains in the possession and enjoyment of it, as before the conveyance, has the credit of being owner ■of such property, and it should be subject to his debts contracted while he so appears to be owner. A man who falsely represents another as being the owner of a thousand dollars’ worth of land, knowing it to be false, and thereby induces a stranger to credit the person so represented, should, if necessary to prevent the creditor’s losing, pay him one thousand dollars.
To enforce these principles, to prevent creditors from suffering by their violation, was the object of the statute of 13 Eliz., c. 5, and is the object of that part of section 2 of our statute for the prevention of frauds and poi’juries, which relates to creditors As to the relief of creditors these statutes are co-extensive; each makes void conveyances made with “ intent ” to defraud creditors; they are declarative only of the common law, which, as now understood, would, without the statutes, have effected all that can be effected with them. The statute of Elizabeth, as to the relief of creditors, has, from its enactment, in courts both of law and equity, uniformly received a most.liberal construction, notwithstanding it subjects the committers of the forbidden fraud to a prosecution for a penalty. Cowp. 343; Roberts on Frauds, 14; 1 Fonb. Eq. 260, 267; 1 Cranch, 316. Our legislature, when they, in 1824, by section 10 of the act “for the punishment of certain offenses therein named,” subjected the maker of a conveyance to defeat creditors to a criminal prosocution, did not intend to prevent the courts from giving as extensive relief to creditors, under the statutes of frauds and perjuries, as they had before given or could have given, had not the act of 1824 been passed. When relief is given against frauds, even of the grosser kind, *the perpetrators are frequently in no worse, and sometimes in a better con *111 dition than they would have been had not the fraud been committed. That the perpetrators of such frauds should be really punished, and thereby such frauds be prevented or made less frequent, •was probably the only object of the legislature. Before the statute of Elizabeth, the courts in England held that a voluntary conveyance to a stranger, made by a person indebted at the time, was void as to creditors ; after, they held that a conveyance to a child by a parent, if the parent was at the time indebted was void, not only .as to debts contracted before, but also as to those contracted after. 1 Fonb. Eq. 260, n. a.
In the case of Russell v. Hammond, 2 Atk. 13, Lord Hardwicke says, that he “ had hardly known of one case, where the grantor had been indebted at the time of the conveyance, that the conveyance had not been deemed fraudulent.”
In the case of Reede v. Livingston, 3 Johns. Ch. 500, Chancellor Eent, after a laborious examination of the English cases, says, that “ the conclusion to be drawn from them is, that if the party be indebted at the time of the voluntary settlement, it is to be presumed fraudulent in respect to such debts, andno circumstances will permit those debts to be affected by the settlement, or repel the legal presumption of the fraud.” It is even doubtful whether, by the English decisions under the 13 Elizabeth, a voluntary conveyance to a child of land worth one thousand dollars, when the parent at the time owned land of the value of four thousand dollars, if the father at the time owed only fifty dollars, would not be deemed fraudulent and void, and the land liable for the debts contracted by the parent, after he made the gift to- his child.
The law abhors fraud; a statute relieving against it must be liberally construed. When we adopt, in substance, an English statute, the construction before given by their courts to their statute is, in general, to be considered as adopted; but when the statute is declarative of the common law, and when the construction would-here be injurious, arising from a settled difference in the mode of •doing business, and from the situation of property, it becomes the duty of the court *not to follow them in their construction. To hold here, that the parent being indebted at the time he makes a voluntary conveyance to his child, is conclusive evidence of fraud, such as can not be rebutted or resisted, no matter how small the debts, or how small the property conveyed to the child, or how *112 ample the property still retained by the parent to pay his debts, and for his own and his family’s support, is going too far; farther than the Supreme Court of the United States went in the case of the Lessee of Hinde v. Longworth, 11 Wheat. 199.
The security of the creditor of ordinary diligence does not require it, and it would be injurious to the debtor and his family, and to society. A parent is under obligations to his children as' well as to his creditors ; those to the creditor are paramount, and to be preferred; but when his circumstances are such as to enable him to discharge both, it is his duty to do so; hardly any man, especially the diligent and prosperous, can say at any time, “I owe not a dollar.” Shall he be prevented from making the most reasonable provision for a child, unless by way of marriage settlement, until he can say so ?
In England, parents before the marriage of their children, but with respect to it, convey their lands to them by way of marriage settlements. The contemplated marriage takes place ; their courts decide that the marriage is a valuable consideration, and that the creditors of the parent, neither prior nor subsequent, can follow the lands into the hands of the children. Marriage settlement is almost unknown here; the donations to children are generally after, presently after the marriage — not connected with it; the-marriage has made it necessary. To force prudent parents into marriage settlements, to discharge their duty to their children, would be giving no additional security to creditors, but the reverse; it would do society no good, but an injury.
That the conveyance of land to a child was in consideration of love and affection, and that the parent was indebted at the time he made the conveyance, is evidence of fraud as to creditors ; but it may be repelled by showing that the debts were small, and that the property retained by the parent was amply sufficient to pay them; that he was in prosperous *circu instances, and not embarrassed, and that the gift to the child was a reasonable provision for him, according to his and the parent’s circumstances. 11 Wheat. 199.
The defendant, Christopher Myers, on March 31,1819, made the bond to Brice, the complainant, conditioned to convey to him a lot in Zanesville, or to pay to him fifteen hundred dollars within five years. Myers did not convey the lot nor pay the money, and' Brice has recovered a judgment against him on the bond for one *113 thousand nine hundred and forty-five dollars and costs. Myershás no other property than an annuity for his life of one hundred . dollars. After the bond was made, on April 17, 1820, Myers conveyed in.fee simple to his sons, the defendants, Isaac, Jacob, William, and to his son-in law the defendant Hahn, in several parcels,, as described in the bill, twelve hundred acres of land; the consideration expressed in each deed is one thousand dollars. At the time the deeds wore made, each grantee made a bond to C. Myers, to pay to him and his wife during their lives, and to the-survivor during his or her life, an annuity of twenty dollars; this was the only valuable consideration for the deeds. C. Myers at the-time owned no other lands, and but little other property, except an equity of redemption in a tract of land, which, in 1822, he released to satisfy the mortgage. C. Myers states, in his answer, that in the spring eff 1819, when he acquired the twelve hundred acres of land, he estimated the lands he gave in exchange for them at nine thousand dollars. Hahn, in his answer, states, that at the-time the deed was made to him for his one hundred and twenty-nine acres, it was not worth more than the annuity he agreed te pay; but there is no evidence in support of the answer. When a child claims to hold land as a purchaser for valuable consideration against a creditor, a suspicion of fraud arises, and more proof of its payment, and of its adequacy is required, than where the purchaser is a stranger. Alexander Harper’s deposition proves that C. Myers, when he obtained of Brice the twelve hundred acres for a farm, said that hid object was to obtain a larger quantity of land to divide among his children, to give each a farm. 0. Myers in his answer states that this was his object. It is manifest ♦that the advancement of the children, and not the annuity, was the object of the conveyances. Love and affection is the only consideration that the defendants can set up. The defendants’ counsel do not insist on any other. To rebut the presumption of fraud which arises from these facts, the defendants contend that, the fifteen hundred dollars contained in the bond, on which the judgment at law has been obtained against C. Myers by Brice, was secured by mortgage, when the deeds were made by C. Myers to his sons and son-in-law. This, it is admitted, does not appear by the bond or by the mortgage, but it is urged- that it is proved by parol testimony, and that this testimony should be admitted by the court.
*114 Alexander Harper testifies, that in the spring of 1819, Brice and 0. Myers came to him and told him that they had agreed to exchange lands; that Myers was to convey his farm in Muskingum county to Brice, for which Brice was to convey to Myers twelve hundred acres, in Licking county, and that they wished him to draw the deeds: that while he was drawing the deeds,'as he thinks, Brice sold to Myers about seven hundred acres, a part of the same tract out of which the twelve hundred acres were taken ; he does not remember the price; Myers made his notes and a mortgage to Brice for the purchase money; he also made a bond to .Brice, to convey to him a lot in Zanesville, estimated at fifteen hundred dollars, the price of two hundred acres of the land sold; that the house and lot belonged to Michael Sockman, who was then in Illinois or Indiana; that two hundred acres of the .land was intended for Sockman, and when the lot was conveyed to Brice he was to release the mortgage as to two hundred acres of ■the land; that there was some conversation as to Brice executing a bond to release the two hundred acres, but the arrangement was effected without.
William Stanberry testifies, that he saw Brice and Sockman together, and that Sockman offered to convey the lot in Zanesville to Brice, if Brice would release from the mortgage two hundred acres of the land. One objection made to it by Brice was that he had assigned the notes and mortgage to the Granville Bank.
Brice, in answer to an interrogatory filed by the defendants, ^states that Sockman, in the fall of 1820, told him that he would not convey the lot in Zanesville unless Myers would pay him fifteen hundred dollars or give him the best lot he purchased of Brice, he thinks lot No. 10; that he recollects no other conversation with Sockman; that Winchel was a part owner of the lands which he, Brice, sold to Myers and exchanged; that, on settlement with Winchel, he assigned to him the notes and mortgage of Myers in payment for his part of the land.
C. Myers states, in his answer, that the purchase of Brice was of six hundred and thirty-four acres; that for the price of four hundred and thirty-four he gave his notes — for two hundred acres, the remainder, he gave the bond for the lot in Zanesville, or fifteen hundred dollars; that to secure the payment of the purchase money, he gave a mortgage on the whole six hundred and thirty-four acres; and that Brice agreed to release two hundred acres on the convey - *115 ance of the lot in Zanesville; that when he released the equity of redemption to Ransom, the holder of the notes and mortgage, he thought all was settled. The other defendants, except Hahn, all state that the purchase of C. Myers was of six hundred and thirty-four acres, and that the. mortgage was for the price of four hundred and thirty-four acres only. Hahn states that the mortgage was for the same.
Sockman states, in his answer, that he offered to convey the lot in Zanesville to Brice, about a year after the bond was made, if Brice would release two hundred acres from the mortgage, according to his contract; that Brice refused, alleging that be had assigned the mortgage to the Granville Bank and had no control over it; from all which it is apparent, that whether the fifteen hundred dollars was secured by mortgage depends on the testimony of Harper. C. Myers, in his answer, states, in general terms, that the purchase money was secured by mortgage. From Sockman’s •answer, and the depositions of Stanberry, and the answer of Brice, nothing is to be gathered but that Sockman offered to convey the lot in Zanesville, if two hundred acres were released from the mortgage, and that Brice refused, and assigned as one reason, says Stanberry, that he had assigned the mortgage to the Granville Bank.
*Brice sold to Myers three hundred and thirty-four acres of land, at about seven dollars and fifty cents per acre. The agreement was made, Harper thinks, in his presence. Notes were given for the purchase money of four hundred and thirty-four acres, payable in one, two, three, and four years, and a mortgage made on the whole six hundred and thirty-four acres, to secure the payment of these notes. For the price of two hundred acres of the land, the remainder of the six hundred aud thirty-four acres, Myers gave the bond to convey the lot in Zanesville, or to pay fifteen hundred dollars in five years. Harper says, in general terms, that the notes and a mortgage were given to secure the purchase money; that two hundred acres were intended for Sock-man, who owned the lot in Zanesville; that two hundred acres were to be released from the mortgage on the conveyance of the lot to Brice; that there was talk of Brice making a bond to that effect, but it was otherwise arranged.
Why was this bond of Myers’ not referred to by the mortgage, if its performance was intended to be secured by the mortgage? *116 Why was it not stated, in the condition of the bond, that the lot was not to be conveyed or the money paid, unless at the same time Brice released from the mortgage two hundred acres of land ?• Why was not a separate bond taken from Brice, as was talked of, binding him to make the release? That the mortgage does not include the fifteen hundred dollars or refer to the bond, that the bond does not require the release of the two hundred acres on the conveyance of the lot or payment of the money, that the bond of Brice to this effect was not executed, the result of mistake or fraud, is neither proved nor urged. The mortgage was taken to show how far the parties agreed to lien the land — the bond to show on what conditions the lot was to be conveyed. They talked of a bond to affect the mortgage and the bond for the Zanesville lot, but it was not executed — it was not agreed to. Some other arrangement was made; what that other arrangement was we know not. If Brice declined making a bond at the time he received the mortgage and title-bond, which would have materially affected them, on what principle can the court construe the mortgage and title-bond as though he had signed the bond for the ^release? The interest of parties in their contracts is as important and sacred as their interest in their land, and is carefully guarded against the legislature by all our constitutions. If when made they are so sacred, we must as scrupulously avoid; making them for the parties as varying them when made. Unlessi the agreement were drawn contrary to the intention of the parties at the time by mistake or fraud, and that clearly proved, this court can not interfere. Sug. Vend. 93, 116, 117; 1 Pet. 13, 15; 1 Johns. Ch. 127; 3 Stark. Ev. 100-105. The parol testimony must be rejected, and we must hold that it is not proved that the fifteen hundred dollars was secured by mortgage, of that Brice was bound to release the two hundred acres from the mortgage on x'eceiving the conveyance of the Zanesville lot.
It is contended again that the demand of Brice is hard and unjust; that he has already got back, in payment for the land, the whole of the land and one hundred acres of the twelve hundred acre tract; that by mistake the mortgage covered one hundred-acres of the twelve hundred tract.
There seems to have been a mistake in the mortgage of one hundred acres of the east part of lot No. 10. This, though, was known to C. Myers when he released the mortgage to Ransom for *117 dhe notes, secured by the mortgage; he says he thought the whole matter was then at rest, but he does not state or prove that the bond for the Zanesville lot was even mentioned at the time. Why was not.a release of it taken, or some reference to it made, if it was then intended to be discharged?
The lots of land in the deeds and in the mortgage are some of them called for by their number, and not by the quantity; hence, perhaps, the error in the quantity as described. The deeds of C. Myers to the other defendants convey eleven or twelve hundred acres; they call for less than a thousand acres. Yet that the mortgage to secure the payment of little more than two-thirds of the price of about six hundred and thirty-four acres should have been drawn for land, in the mortgage said to be seven hundred and seventy-one acres, and that the bond for the payment of fifteen hundred dollars should have a penalty of five thousand dollars, are circumstances that must awaken suspicion of unfairness; *the penalty has done no harm — the mortgage with full knowledge has been released.
In 1819, when C. Myers purchased the land of Brice, the currency of the country was an unsound one, incumbered by all the notes of the local banks ; they were abundant and had depreciated at least twenty-five per cent., but were passing at the sums for which they were made; the value of land and other property was estimated in reference to this currency. At the time C. Myers released the mortgage in 1822, the depreciated notes of the local banks had ceased to circulate. The price of land and other property had in consequence fallen from thirty to fifty per cent, at least. Eew who purchased land on a credit in 1819 could, in 1822, sell it for two-thirds of the purchase money. Myers appears to have purchased for speculation. The lot in Zanesville with which he was to pay fifteen hundred dollars in five years, was the property of his son-in-law, Sockman. The payments which fell due in 1820 and 1821 were not made. In 1822, when the third payment became due, the lands had fallen, and the mortgage was released in satisfaction of the three first, and also of the last payment to become due in 1823. If the land had raised in value, so that Myers could have paid for the whole, by the sale of two hundred acres in Í822,- whereby he could have gained the four hundred and thirtyr four acres by his trade with Brice, the court could not have re *118 lieved Brice; we can not, therefore, as lands have fallen, relieve Myers.
It is stated in the answer of C. Myers, that Brice for a time had possession of the lot in Zanesville. There is no evidence of this fact; if there had been, the court would have ordered Brice to have credited the value of the net rents to Myers. For it is a. principle without exception, that when a party comes into chancery for relief, he must do justice, or relief will be refused. 1 Fonb. Eq. 259.
Sockman admits, by his answer, that when he purchased of Hahn the land conveyed to Hahn by C. Myers, he knew of the-bond on which the judgment of Brice was obtained, and of the consideration for which the land was conveyed to Hahn, and the-circumstances attending the exchange and purchase of lands by C. Myers of Brice.
*Upon the whole, the court .are of opinion that the deeds of C. Myers to his co-defendants, his sons and son-in-law Hahn, and the deed from Hahn to Sockman, are fraudulent and void, as to the judgment of Brice, and so declare them.
The court ordered, that on failure of C. Myers, by a fixed dayr to pay the amount of the judgment, and the costs of this suit, that the land conveyed by C. Myers to each defendant should be separately valued, and the valuation returned to the next Supreme Court, that the court might then order such part of each tract to-be sold as should appear necessary. It was suggested that the-lands were valuable, and that arrangements would be made between the parties.