# CHARLESTON.

L. E. TIERNEY *v.* UNITED POCAHONTAS COAL COMPANY *et als.*

Submitted October 25, 1921.   Decided November 1, 1921.

1. APPEAL AND ERROR—*Decree, Unquestioned Until After Time for Review, Cannot be Assailed on Appeal from Subsequent Decree.*

   An appealable decree entered in a cause, not in any way questioned until after expiration of the period of limitation, cannot be assailed on an appeal from a subsequent decree into which it has been carried as a basis of adjudication, allowed after expiration of such period. (p. 405).

2. SAME—*Where Decree Against Several Parties Has Been Affirmed, it is Error in Subsequent Decree in Execution of First to Relieve Against Part Only.*

   If, on a bill seeking relief against several persons, on the ground of a constructive trust or constructive fraud, an interlocurtory appealable decree against all of such persons has been entered and then affirmed on an appeal, it is erroneous, in a subsequent decree made in execution of the first, to grant the relief sought against some of such defendants and not against the others, in the absence of disclosure of error on the face of such first decree and subsequent impeachment thereof. (p. 405).

3. EVIDENCE—*Ordinarily Approximation is the Limit of Endeavor in Ascertaining Property Values.*

   Ordinarily, approximation is the limit of endeavor in the ascertainment of values of property, and, to attain that, it is necessary to exclude all fanciful and purely speculative elements or grounds of value, as determined by the facts and circumstances of any given case. (p. 406).

4. CORPORATIONS—*In Ascertaining Value of Coal Lease, Transferred in Fraud of Stockholders, Seams Not Opened, Containing More Coal Than Will Probably be Worked Pending Lease, Properly Excluded.*

   In the ascertainment of the value of a coal lease limited in time and taken upon a royalty basis, it is proper to exclude the coal in seams not opened, explored nor in any way developed in the first half of the term of the lease, there being more coal in the one seam opened and worked than will probably be mined within the potential life of the lease. (p. 407).

5.   EVIDENCE—*Estimated Profit From Operating Mine is Not Dis-*
     *tinct Item of Value of Lease to be Added.*

     In such case, the estimated profit from the operation of the
     mine opened under the lease does not constitute a separate and
     distinct item of value to be added to that of the property. It
     is only a circumstance tending to prove the value of the lease,
     to be weighed and considered with other evidence. (p. 407).

6.   SAME—*In Determining Value of Coal Lease, Evidence of Prac-*
     *tical and Experienced Miners Held Controlling.*

     In view of the uncertainty of estimated and unearned pro-
     fits of an equipped and operated coal lease, extending over a
     long future period, and the slightness of value in an unequipped
     and unoperated coal lease taken upon the royalty basis, usually
     at ten cents per ton, the evidence of practical and experienced
     coal operators, to the effect that the value of such a lease fully
     equipped and in operation is the equivalent of the value of the
     recoverable coal in the lease, at ten cents per ton, is controlling
     and constitutes a sound basis of judicial ascertainment   and
     declaration of value. (p. 408).

7.   CORPORATIONS—*In Ascertaining Value of Coal Lease, Trans-*
     *ferred in Fraud of Minority Stockholders, Equipment or*
     *Liquid Assets Should Not be Added and Liabilities Should*
     *Not be Deducted.*

     In the absence of special circumstances, no other property
     of the owner of the lease, such as equipment or liquid assets,
     should be added to such value, nor should the liabilities be de-
     ducted therefrom. (p. 408).

8.   SAME—*In Ascertaining Value of a Coal Lease Transferred in*
     *Fraud of Minority Stockholders, Coal Subject to Haulage*
     *Charge Equal to Royalty Properly Omitted.*

     If, in such case, part of the coal included in the leases, is
     subject to a charge for haulage through another property,
     equal to the royalty, it is properly omitted in such estimation
     of tonnage value. (p. 409).

9.   SAME—*In Ascertaining Value of a Coal Lease Transferred in*
     *Fraud of Minority Stockholders, Funds and Property Ac-*
     *cumulated by Previous Operations, Not Used in Conducting*
     *the Lease, Not Considered.*

     Funds and property accumulated by previous operations,
     constituting undivided profits, and not necessarily used in the
     conduct of the mining operations, should be added to the
     tonnage value, in the ascertainment of the entire value of
     such property. (p. 410).

                         89 W. Va.

10.  SAME—*In Ascertaining Value of Coal Lease Transferred in Fraud of Minority Stockholders, Value of Capital Stock of Another Corporation Owned by Operating Company Properly Added to Tonnage Value.*

It is proper also to add to such, tonnage value the value of capital stock of another corporation, owned by the operating company.  (p. 410).

11.  SAME—*In Ascertaining by Tonnage Method Value of Coal .Lease Transferred in Fraud of Minority Stockholders, Deductions Not to be Made for Lessee's Inability to Mine all the Coal within Life of Lease.*

In seeking the value of a coal property, by the tonnage value method above described, deductions of tonnage cannot be made upon the theory of inability of the lessee to mine all of the coal within the life of the lease, because the mining capacity of the lessee is presumptively variable and within his own control.  (p. 411).

12.  SAME—*In Adjudicating Liability to Stockholders of Corporations Taken Over at Inadequate Prices, Profits from Use of Property Added to Value of Dissenting Stockholders' Stock Should be Decreed.*

In an adjudication of liability of a corporation and individuals by whom it was formed, to stockholders in other corporations taken over by it, at inadequate prices and against the will of such stockholders, it is proper to include in the decree, a sum in addition to the value of the stock of the dissenting stockholders, as profits derived or derivable from the use of the property so wrongfully taken over, measured' and determined by the legal rate of interest applied to the value of such stock.  (p. 411).

Appeal from Circuit Court, McDowell County.

Suit by L. E. Tierney against the United· Pocahontas Coal Company and others, in which a decree was modified and affirmed on appeal, and from a subsequent decree executing the former one by requiring payments of money by the United Pocahontas Coal Company and Worth Kilpatrick to L. E. Tierney and the Flat Top National Bank, the losing parties appeal, and the others assign cross-errors.

*Modified and affirmed.*

*Malcolm Jackson,* and *Anderson, Strother, Hughes & Curd,* for appellants.

*French, Easley & Easley, Sanders, Crockett, Fox & Sanders* and *Russell S. Ritz,* for appellee.

POFFENBARGER, JUDGE:

The decree constituting the basis of the former appeal in this cause disposed of by the decision reported in 85 W. Va., 545, was interlocutory and appealable only because it settled the principles of the cause.    From a subsequent decree executing the former one, by requirements of payment of large sums of money, by the United Pocahontas Coal Company and Worth Kilpatrick, to L. E. Tierney and the Flat Top National Bank, the losing parties have appealed and the others have cross-assigned errors.

For some reason not disclosed, J. A. Armstrong, G. C. Armstrong, A. Stone and A. D. Rice, associates of Kilpatrick in the sales of the properties of the Zenith and Indian Ridge coal companies to the United Pocahontas Coal Company, complained of by Tierney and the Flat Top National Bank, were excluded from the decree.    Right to any decree at all against the United Pocahontas Coal Company is denied in argument, on the ground that it was a purchaser for value from the other two companies and had acquired    full legal and equitable title to their properties, before this suit was instituted.    But, if this position is untenable, then it is urged that the decree should have gone against the two Armstrongs, Stone and Rice as well as the company and Kilpatrick.    The former decree adjudicated liability of the United Pocahontas Coal Company and, as to that adjudication, it was affirmed. Assault upon it is now barred by lapse of time.    It was entered May 12, 1919, and this appeal was taken from another decree, May 6, 1921.    The limitation is one year.    If it had not been appealed from and affirmed, time would preclude this complaint.    *Barbour, Stedman & Herod* v. *Tompkins,* 58 W. Va. 572.    The former decree may be interpreted as having imposed liability, upon the ground of legal or constructive fraud, not actual fraud.    It characterizes the transaction as an ''illegal and unlawful merger'' and ''a fraud on the rights and holdings'' of the plaintiffs.    All of this is consistent with the theory of constructive fraud.    In such cases,

equity distributes the burden among those guilty of the wrongful act, when it can do so without causing undue delay or other hardship. *Chamberlayne* v. *Temple,* 2 Rand. 384; *Janvrin* v. *Curtis,* 63 N. H. 312; *Brice* v. *Myers,* 5 Ohio 121; *Cornish* v. *Clark,* 14 L. R. Eq., 184. In the absence of an adjudication of actual fraud, the principle or theory of the former decree should have been adhered to. As to the ground of liability, no new evidence has been taken, wherefore it remains just as it was under the former decree. There is personal liability upon all of the defendants, but, upon a full development of all the facts, it may be equitable, as among them, to require ultimate payment of the entire amounts of the decrees, by the United Pocahontas Coal Company, since it took over all the property in question. But no cross-relief among the defendants has been asked, and we decide nothing as to any supposed right thereto.

Both the commissioner's report and the decree fix the values of the properties of the Zenith Coal and Coke Company and the Indian Ridge Coal and Coke Company, by adding to the value of the unmined coal in their leases at 10 cents per ton, what are termed miscellaneous and current assets and the physical values of their plants, and then deducting their liabilities. Tierney and the bank complain of the omission of the coal in three undeveloped seams of coal within the leases, estimated by a witness, as aggregating over 11,000,000 tons. They insist also upon addition of nearly $2,000,000.00 for the estimated present worth of profits derivable from operation of the properties, during the potential lives of the leases. For disallowance of these alleged elements of value, they excepted to the report and here complain of the overruling of their exceptions. They claim the decree should have awarded Tierney $224,242.20 instead of $72,813,40, and the Flat Top National Bank $81,723.43 instead of $27,259.54, including interest. On the other hand, the appellants complain of an allowance of too much tonnage and inclusion of miscellaneous and current assets and physical plant values. They also deny liability for interest and charge a duplication of values in one instance.

As in almost, if not quite, all cases of ascertainment of prop-

erty values, approximation is the limit of endeavor here. To accomplish a reasonable and fair approximation upon such an inquiry, it is necessary to exclude all fanciful and purely speculative elements or grounds of value; and the facts and circumstances of each particular case must be allowed, as a general rule, to determine the character of the elements or grounds of value set up and relied upon.

Omission of the coal in the three unworked seams was manifestly proper. None of the coal was owned in fee by the two old companies merged into, and consolidated with the new one. They were mere lessees. The value of the coal to them depended upon the mining and marketing thereof. It did not belong to them. They were to pay for it as they should take it out. At the rates at which they had been severing and removing it, there would have been no occasion to touch any of the three omitted seams, within the potential lives of the leases. The No. 3 seam would have furnished more coal than was likely to be mined, and, presumptively, the expense of new openings in other seams would not be incurred under such circumstances. As use of the omitted coal was improbable, it had no appreciable value, for its value was to be found only in utilization thereof.

The probability of profits to arise from the operation of the properties is only a circumstance indicating their value. Not having been earned and being dependent upon future conditions and contingencies, they cannot be accepted as constituting present values in and of themselves. Out of the income, it is necessary to pay the royalties and operating and marketing expenses and return the principal with interest on it, in the case of the purchase of such property. The subject matter of the purchase, the right of mining, is constantly depleted by the operations, and ceases to exist with the exhaustion of the coal or termination of the lease. Besides, it is impossible to say, with any degree of certainty, what per cent. of profits could be realized from mining operations extending over periods of time ranging from fifteen to thirty-eight years. The trial court limited the evidence of probable profits to its proper function, namely, reflection of value in the property and rights of the companies.

Ordinarily, a mining lease under which nothing has been done, no entries driven, no equipment nor facilities installed, has no market value. It imposes an obligation fully equivalent, by way of reciprocation, to the advantage or benefit it confers. It alone does not give or carry a value equal to 10 cents per ton for all the coal in the territory. Generally, it obligates the lessee to pay about that much for his privilege, but, not having paid it, he cannot be deemed to have a value in his privilege, determinable upon that basis. According to the testimony of expert coal operators, the entire plant consisting of the lease, machinery, buildings, appliances, operating capital and equipment of all kinds, is worth a sum of money equivalent to 10 cents per ton for all of the coal in the lease. A prudent operator makes his equipment correspond with the requirements of his lease. His lease without equipment is practically valueless. The equipment and lease taken together have value. The standard of value adopted allows something for the mining privilege over and above the costs of equipment. At any rate, the value of the equipment in these cases is very much less than the tonnage value of the coal. Properties of the class of these are frequently valued for several purposes and the expert witnesses say such a property, fully equipped, is valued at a sum equal to the value of the coal at 10 cents per ton. What has been said makes it apparent that the tonnage value and the value of the equipment cannot be added. To do so would include, as the larger item, what, standing alone, has no value. Of course, the value found on the tonnage basis is not exact and it may not be closely approximate, but is one that is recognized and used extensively by coal operators, in transactions involving questions of plant values. No doubt, they use it because it is more closely approximate than one obtainable in any other known way. Nor should the probable profits be added to the tonnage value. Edward Cooper, an experienced coal operator, covered all the elements of value in the use of these terms: "The profits received from the company, that is, the stockholders' profits, in my opinion, would not be much in excess of the profits received from the money recovered from an out and out sale of the property based on

a return of ten cents a tonnage, unless you re-invested the
$1,300,000 in like property.'' This clearly proves he did
not regard future profits as present values to be added to
the tonnage value. J. W. Beury who participated in nego-
tiations for the purchase of the properties of the United Po-
cahontas Coal Company, embracing a great deal more coal
than the two old companies had, based his offers of $1,000,-
000.00, $1,200,000.00 and $1,500,000.00, made at different
times, on probable profits, as one test, and on tonnage value,
as another. No price was based upon both estimated profits
and tonnage combined. And then the highest offer was less
than ten cents per ton. Of course, there is some conflict in
the evidence. Tierney and the bank make very large claims,
founded largley upon propositions we have already disap-
proved. The large profits made in other mining companies
in which Mr. Tierney is interested do not disprove the sound-
ness of the tonnage rule of valuation. They are variable and
subject to many contingencies, and, as has been stated, they
must return the investment with interest thereon, besides
paying the royalties. Upon these principles and conclusions,
it becomes necessary to eliminate from the statements of
value, the items designated ''Miscellaneous and current as-
sets'' and ''Physical value of plant,'' on the credit side, and
the item designated ''Liabilities'' on the debtor side. They
are very considerable sums. In the case of the Zenith Coal
and Coke Co., they are, respectively, $65,004.17, $221,810.75
and $113,992.33; and, in the case of the Indian Ridge Coal
and Coke Co., $241,551.99, $201,941.25 and $15,226.52, re-
spectively. But for a deduction the trial court made from
the tonnage, this would make the tonnage value of the former
company $522,689.30 and of the latter $414,982.90. Because
the coal in the Burkes Garden lease of the Zenith company
is subjected to a double royalty charge of 10 cents, making
the total 20 cents, one charge being the royalty and the other
a charge for haulage through the Pocahontas Coal and Coke
Company property, the trial court deducted the tonnage of
the Burkes Garden lease, amounting to 2,310,578, leaving
the tonnage of the Zenith company, for valuation purposes,
at 2,916,315, and making its value, exclusive of the items here

eliminated, $291,631.50. Tierney's interest in the Zenith company is 3.4% of its value, or $9,915.47. The Indian Ridge company owned 96½% of the stock of the Zenith, which, calculated upon its tonnage value, amounts to $281,424.40. This is to be added to the tonnage value of the Indian Ridge company. But there is still another addition to be made to it. The "Miscellaneous and current assets" item in that account embraces large amounts representing undivided profits accrued from previous operation, which cannot be deemed operating capital covered by the tonnage valuation. These amounts are cash $49,290.94, bills receivable $149,691.07 and real estate not used in mining operations $26,405.31, and they make an aggregate sum of $225,387.32. The total Indian Ridge company valuation is $921,794.62, made up of tonnage value, $414,982.90, cash and other items above described, $225,387.32 and percentage of Zenith value, $281,424.40. Of this amount, Tierney is entitled to 2% or $18,435.89, and the Flat Top National Bank 1 1/3%, or $12,290.59.

In addition to dividends on their stock, amounting to about 6%, Tierney and the bank obtain, as of March 31, 1915, several times the par value of their stock. Tierney's allowance on account of his Zenith company stock amounts to more than 600% and those made to him and the bank on account of the other company, amount to more than 1200% of their stock holdings. On the basis here adopted, the plaintiffs obtain results about as favorable as those indicated in Col. Tierney's evidence respecting the earnings of other mining companies in the Pocahontas field, ranging from 650% to 1600%, over periods of 26 to 29 years of operation.

There is no duplication in the addition of 96½% of the value of the Zenith company to the total value of the Indian Ridge company, for the latter owned that much of the former, and Tierney and the bank were entitled to their percentages out of the entire value of the Indian Ridge company, and Tierney, to his percentage out of the entire value of the Zenith. He and the Indian Ridge company practically owned the Zenith. They owned all of its stock except two shares. Hence, it was proper substantially to divide its property between them.

Still further reductions in values are insisted upon by the appellants. Their argument is that, in all probability, the coal estimated in the tonnage would not have been mined under the leases, since the mining at the rate maintained would not have exhausted it. In this connection, much stress is laid upon these facts: the leases were all for 30 year terms which, in the cases of two of them, had run for 15 years and the other for 22 years; one of them carried no right of renewal; and the other two were renewable for 30 years, only upon performance of conditions which had already been omitted. The tonnage of the lease having no renewal privilege is not included in the valuation. As to the other leases, the argument assumes what has not happened and may never occur. Performance of the broken conditions may be waived. Ordinarily, a renewal to an equipped and prosperous company already operating the property would not be refused and a new lease executed to some other person or concern having no equipment, so as to interrupt the mining, at the risk of injury and damage to the mine and loss of profits. Besides, it is possible greatly to increase the rate of mining, and such an increase may be assumed, as a probability, if found to be necessary as a means of preventing loss of mining opportunity.

If one taking the property of another, converting it to his own use and realizing a profit from it, is not chargeable with damages corresponding to the value of the use, he not only escapes liability for full compensation to the injured party, but also profits by his own wrong. Here the defendants may be regarded, upon one view of their status, as having wrongfully taken and used the property of the plaintiffs and derived profit from such use. Upon another, they are constructive, if not actual, trustees using and deriving profits from the property. There is as much reason for requiring them to account for the profits, as for requiring them to restore the property. It may not be accurate to call such compensation interest, but it is not unfair nor unreasonable, as regards them, to measure it by the interest rate or rule. It would be impossible to deny compensation equivalent to interest, under the circumstances here disclosed, consistently with our decisions. *Cresap* v.

*Brown,* 82 W. Va. 467; *McCullough* v. *Clark,* 88 W. Va. 22, 106 S. E. 61; *W. Va. Gas Co.* v. *Pentress Gas Co.,* 84 W. Va., 448; *Lutz* v. *Williams,* 84 W. Va. 217. The element of profit accruing to the wrongdoer from the use of the property always imposes interest. In *Cross* v. *Cross,* 4 Gratt. 258, it was held that one holding slaves of another, not in a fiduciary capacity, was not chargeable with interest on estimated hires. The holding would no doubt have been different, if the hires had been actually collected. *Baird* v. *Bland,* 5 Munf. 492. It has been generally held in Virginia, under the statute as we have it, that interest will not be allowed upon conjectural and unliquidated amounts. *Baird* v. *Bland,* cited; *Roots* v. *Stone,* 2 Leigh 650; *Auditor* v. *Dugger and Foley,* 3 Leigh 241; *Stearns* v. *Mason,* 24 Gratt. 484; *Gibson* v. *The Governor,* 11 Leigh 600. Some of these decisions deny interest because of doubt as to the defendant's liability and others, on account of the nature of the liability asserted. In this cause, there has never been any room for doubt as to liability. The controversy has been limited at all times to the amount of the liability. Nor can it be said that the cause of action sounded in damages, so as to make the demand an unliquidated one, in the sense in which such demands are sometimes defined. We are clearly of the opinion that interest as damages, or rendition of profits realized from the property by the defendants, should be added to the amounts ·hereinbefore ascertained as the sums to be decreed. From the accrual of the right of action until the date as of which the commissioner made up his report, five years and ten months elapsed. Interest for that period amounts to 35% of the principal. A 35% addition makes the amounts to be decreed to Tierney, on account of his Zenith company stock, $13,385.88, and on account of his Indian Ridge company stock, $24,888.45, total $38,254.33; and to the Flat Top National Bank, $16,592.30.

The decree complained of will be so modified as to require payment of the said sums of $38,254.33 to L. E. Tierney and $16,592.30, to the Flat Top National Bank, respectively, together with their costs, by the United Pocahontas Coal Company, Worth Kilpatrick, J. A. Armstrong, G. C. Armstrong, A. Stone and A. D. Rice, with interest on said debts from

January 31, 1921, until paid, and, as so modified, it will be affirmed.

*Modified and affirmed.*