MOURIKAS et al. v. VARDIANOS.
No. 5747.

Circuit Court of Appeals, Fourth Circuit.
July 26, 1948.

54

Bernard J. Pettigrew and Roy S. Samms, Jr., both of Charleston, W. Va., for appellants.

Stanley C. Morris of Charleston, W. Va. (Howard N. Luckey and Steptoe & Johnson, all of Charleston, W. Va., on the brief), for appellee.

Before PARKER, Circuit Judge, PRETTYMAN, Associate Justice United States Court of Appeals for the District of Columbia (sitting by special assignment), and BARKSDALE, District Judge.

### BARKSDALE, District Judge.

The plaintiff, Mary E. Vardianos, instituted this action in September 1947 against the defendants, Gus Mourikas, Rebecca, his wife, Pete, their infant son, and Tom Mourikas, the brother of Gus, to recover the sum of $15,400 in currency alleged to have been converted by the defendants to their own use, which currency was the property of the plaintiff, jurisdiction being based upon diversity of citizenship. The court dismissed the action as to the infant, Pete Mourikas, and after the jury had returned a special verdict finding that the alleged conversion had taken place, the court added interest from the date of the conversion and rendered a judgment against the defendants in the sum of $17,540.60, with interest thereon until paid. From this judgment rendered against them, the said defendants have prosecuted their appeal to this court.

A great many of the facts are not controverted. The verdict of the jury in favor of the plaintiff has resolved all conflicts of testimony in her favor. All the facts of the case are strange and unusual, but it is interesting to note that the controverted facts are no more fantastic than the facts which were admitted. Without going into detail, the facts which the jury might fairly have found from the evidence may briefly be stated as follows:

At the time of the institution of this action, the plaintiff had remarried and lived with her husband in Ohio. During all of the occurrences which led up to the institution of this action, she was the widow of George Theofanous, who died in May 1945, leaving his entire estate by will to his wife. Both George and Mary Theofanous were natives of Greece, as were the defendants, Tom and Gus Mourikas. George and Mary Theofanous were naturalized American citizens, while Tom and Gus Mourikas were never naturalized. Rebecca Mourikas, the wife of Gus, is a native born American citizen. Prior to the death of George Theofanous, all of the parties had for many years been successfully engaged in the restaurant business in Charleston, West Virginia, and had accumulated substantial estates in money and property. Gus and Tom Mourikas retired from business about the middle of the year 1945, which was shortly after the death of George Theofanous. During his life time, George Theofanous regarded the Mourikas family as his close and confidential friends, and after his death, his widow considered Gus and Tom Mourikas her most dependable friends and advisers. During the lifetime of her husband, the plaintiff had

assisted in the restaurant, but devoted most of her time to making a home for her husband and two infant sons. She took little or no part in the management of her husband's business, and has never become fluent in the English language. At the time of his death, George Theofanous had in a safe deposit box in a Charleston bank at least the sum of $16,500. Prior to July 1, 1945, Gus Mourikas, in the presence of his wife and his brother Tom, told Mrs. Theofanous that, because of war conditions, she should take most of her money out of her safe deposit box and keep it at home, but that it was advisable to leave some of the money in the box. He told her that he and the members of his family were keeping money in their home and had built a secret compartment under the flooring of their house for this purpose. Thereupon, the plaintiff removed $14,000 in currency from her safe deposit box, placed it in a green tin box, and concealed it in a closet of her home. On August 3, 1945, Mary Theofanous sold the restaurant business, which had been bequeathed to her by her husband, for $14,000 cash. She placed this $14,000 in currency in the same green box at her home, thus making a total of $28,000 in the box. Besides this sum of money, she had elsewhere other currency and bonds to a substantial amount. About August 9, 1945, Mary Theofanous and her two sons went to the Mourikas home for a visit. While there, a member of the Mourikas family, all of whom lived together in one house, mentioned that a mutual friend, who lived in Ohio, was sick, and Gus Mourikas suggested to Mrs. Theofanous that she should go and visit him. She replied that she could not go on account of the fact that she had her money in her house. Gus Mourikas then said that she could leave her money at the Mourikas home and take the trip. On Saturday afternoon, August 11, 1945, Mrs. Theofanous telephoned to the Mourikas home and inquired if they were still willing for her to leave the money with them. Tom Mourikas replied that he would talk to Gus about it, and a little later Gus came to the telephone and told her that she might leave the money with them. That night, Mrs. Theofanous and her son

counted the money in the green box consisting of one $1,000 bill, one $500 bill, and a number of $100, $50, $20 and $10 bills. They tied the currency, other than the $1,000 bill, into bundles, each containing $1,000, made a tally sheet showing that the currency totalled the sum of $28,000, placed the currency in the box with the tally sheet on top, pressed the contents down tightly, clamped the lid of the box and locked it. They then wrapped the box in a newspaper and took it to the Mourikas home. Gus Mourikas and his wife were there, and Mrs. Theofanous gave Gus the box and told him that it contained $28,000. She offered to open the box and count the money, but found that she had inadvertently left the key at home. She suggested sending her son Tommy home for the key, but Gus said it would not be necessary to count the money, as whatever was in the box would still be in it when it was returned to her. So it was not counted. A little later, Tom Mourikas came in and was told how much money was in the box. Whereupon, Mrs. Theofanous and her sons departed, and the next morning went to Ohio to visit their friend. On Tuesday, August 14, 1945, Mrs. Theofanous, having been advised that the war was about over and the Government might stop selling bonds, telephoned to Tom Mourikas in Charleston and requested that some member of his family come to New Boston, Ohio, where she was visiting, bring her $4,000 in currency from the box, and help her persuade the sick friend to go to a hospital. Being reminded by Tom Mourikas that the box was locked and he had no key, she told him to break open the box and bring the money. The box was broken open, and Tom and Pete Mourikas withdrew $4,000 and drove to New Boston, Ohio, that evening, delivering the currency to Mrs. Theofanous the following morning.

Mrs. Theofanous and her two sons returned to their home in Charleston the evening of Sunday, August 19, 1945. The next evening, Mrs. Theofanous and her two sons went to the Mourikas home to get her money. Gus and his wife were there. They seemed constrained—not cordial and friendly as usual. After some conversation,

Mrs. Theofanous said she had come for her money, to which Gus replied that there was no hurry. Later, Mrs. Theofanous repeated her request, and asked Mrs. Mourikas to call a taxi for her. Gus again delayed, and did not go upstairs for the box until the taxi had arrived and its horn began to blow outside. Then Gus went upstairs, and after a considerable time returned with the tin box in a large paper bag tied around with string, stating that it took him some time to find the bag, that he had put the box in the bag so the taxi driver would not see it, and that there was no use to count the money. Mrs. Theofanous and her sons then returned home, and upon opening the box, they discovered that more of the money was missing than the $4,000 which had been brought to Mrs. Theofanous in Ohio. Greatly agitated, Mrs. Theofanous called the Mourikas home, and reported that some of her money was missing. Gus and Tom Mourikas came to her home, and when the money was counted, it was found that the box contained only $8,600. The $4,000 which had been brought to Mrs. Theofanous in Ohio, together with the $8,600 remaining in the box, made a total of $12,600, which left a shortage of $15,400, from the $28,000 originally in the box. It was for this sum of $15,400 that this action was instituted.

After Mrs. Theofanous discovered the shortage of the money in the box, she charged the defendants with taking it, and they denied that there was any shortage, or any responsibility for the shortage if such shortage existed. Numerous occurrences took place. Mrs. Theofanous and her two sons made repeated visits to the Mourikas home in the unavailing effort to find her money. She suggested "going to the law", but the Mourikases counseled against that. Gus Mourikas told her that no outsider could have gained access to the room in his home in which her money had been kept. He showed her the metal locker in which he had placed her money, which was in good condition, with its lock unbroken. Tom Mourikas told her to give them plenty of time, as it would take about a year's time for them to thoroughly search their home. At the suggestion and expense of Tom Mourikas, Mrs. Theofanous and her two sons, accompanied by Tom, made two visits to a fortune teller, whose occult powers were sadly insufficient to locate the missing money. Pete and Rebecca Mourikas searched the Theofanous home without results. Tom Mourikas told Mrs. Theofanous to leave a window of her home open at all times, so that if any member of the Mourikas family had the money he could drop it in without being seen. No trace of the missing money was ever discovered, so finally this action was instituted.

At the conclusion of the trial, the court submitted interrogatories to the jury, which the jury answered, the interrogatories and answers being as follows:

1. How much money was in the box when it was left at the defendants' home by the plaintiff? $28,000.

2. How much was in it when she got the box back into her possession? $8,600.

(If there is a difference of more than $4,000 in the above two sums, answer question 3. Otherwise, do not answer any further questions.)

3. (a) Did any one or more of the defendants wrongfully take any money from the box? Yes.

(b) If so, who took it and how much? Gus Mourikas and Tom Mourikas. $15,400.

(If you answer "No" to 3(a), you need not answer 3(b) or 4(a) and 4(b).)

4. (a) If you believe one or more of the defendants wrongfully took money from the box, do you further believe that other of the defendants conspired in taking or concealing this money? Yes

(b) If so, which of the other defendants? Rebecca Mourikas.

(If your answer to 4(a) is "No", do not answer 4(b).

In their brief, appellants (defendants below) complain that the plaintiff was permitted to rely upon the ground of conspiracy, when conversion and not conspiracy was pleaded. The charge of conversion against joint defendants necessarily implies concert of action on their part, the defendants were not taken by surprise, and we hold that it was entirely proper for the

court to make the inquiry as to conspiracy propounded in Interrogatory 4.

■ Appellants also complain generally of the form of the interrogatories. We find no merit in this contention. The form of the interrogatories was in the sound discretion of the court, and we are satisfied that the interrogatories propounded by the court fully and fairly submitted the pertinent issues to the jury.

Appellants also complain of the court's charge to the jury. It is our conclusion that the court's charge fully and fairly covered the law of the case, and was eminently fair to the defendants, both in its declaration of the principles of law and its comments on the evidence.

■ Appellants also contend that the evidence was not sufficient to justify a verdict against them. As heretofore indicated, the evidence in this case undoubtedly discloses a strange, if not fantastic, state of facts. However, as to most of the salient facts, there is no controversy, and as to the facts in controversy, we are satisfied that the evidence was amply sufficient to support the conclusion reached by the jury. The determination of the weight and credibility of evidence is peculiarly a jury function.

■ Although not mentioned in their brief, appellants' counsel contended in oral argument that the District Court erred in entering judgment against the defendants, not only for the sum which the jury found they had wrongfully converted, but in adding thereto interest from the date of conversion. No interrogatory was submitted to the jury as to interest, and neither plaintiff nor defendants made any demand that the question of interest be submitted to the jury. Rule 49 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, "Special Verdicts and Interrogatories", provides in part: " * * * As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."

It therefore seems clear that it was entirely proper for the court, after the return of the special verdict, to pass upon the question of interest, although ordinarily the question of whether or not interest should be allowed, and from what date, is for the jury.

■ On the question of whether or not the court erred in allowing interest from the date of conversion, the authorities seem to fully sustain the court's action. It is quite true that interest may not be allowed upon a disputed claim uncertain in amount, until the correct amount of the claim has been judicially ascertained. Lockard v. City of Salem, W.Va. 1947, 43 S.E.2d 239. But here, although the justness of the claim has been vigorously disputed, there has never been any real question as to the amount. The jury found as a fact that the defendants converted the sum of $15,400, the property of the plaintiff, to their own use on August 11, 1945. The fact of the conversion having been established by the jury's verdict, it would be most inequitable to permit the defendants to have the use of this money from the date of conversion until the date of judgment without being charged interest for the use thereof. As was said in Tierney v. United Pocahontas Coal Co., 89 W.Va. 402, 109 S.E. 339, 343: "If one taking the property of another, converting it to his own use and realizing a profit from it, is not chargeable with damages corresponding to the value of the use, he not only escapes liability for full compensation to the injured party, but also profits by his own wrong." See also Cecil v. Clark, 49 W.Va. 459, 39 S.E. 202; Cresap v. Brown, 82 W.Va. 467, 96 S.E. 66, Pittsburgh & West Virginia Gas Co. v. Pentress Gas Co., 84 W.Va. 449, 100 S.E. 296, 7 A.L.R. 901; Pine &c. Co. v. American Engineering &c. Co., 97 W.Va. 471, 125 S.E. 375.

In the note to Necedah Manufacturing Corp. v. Juneau County, 206 Wis. 316, 237 N.W. 277, 240 N.W. 405, 96 A.L.R. 4, at page 74, it is stated: "The general rule in actions of trover, or actions in the nature of trover, for the conversion of personal property, is that the measure of damages is the value of the property at the time and place of conversion, with interest from that time. In only one jurisdiction (Ore-

gon) does a rule to the contrary seem to prevail, * * * "

We therefore hold that the action of the court, in adding interest from date of conversion to date of judgment, to the principal sum converted, in order to determine the amount for which judgment should be entered, was entirely proper.

The final contention of the appellants, and the only one in our opinion which is substantial, is appellants' contention that the court erred in permitting the introduction of certain testimony to the effect that in 1931 and 1933 defendant, Tom Mourikas, had been convicted of receiving stolen goods and that defendant, Gus Mourikas, had been indicted and pleaded guilty to the 1933 charge, but was later permitted to withdraw his plea. The circumstances surrounding the admission of this evidence are about as follows:

At a pretrial conference, the question of whether defendants might introduce evidence of their good character being discussed, the judge indicated that, this being a civil action, such evidence would not be admissible. At the trial, defendants summoned character witnesses, but rested without offering the testimony of these witnesses. Whereupon, plaintiff's counsel recalled Tom Mourikas for further cross-examination, and began asking him questions preliminary to his interrogation as to previous convictions for receiving stolen goods. Upon the objection of the defendants, plaintiff's counsel pointed out that in his opening statement defendants' counsel had stated that these defendants had never been accused of stealing a cent from any living soul, that Gus Mourikas had testified that all his family were honest, and that he was equally honest, and that Rebecca Mourikas had testified that no member of her family would have stolen the money. Plaintiff's counsel contended that the foregoing had put defendants' character in issue, and that he was therefore entitled to attack defendants' character. The court, agreeing with the contention of plaintiff's counsel, overruled the objection of the defendants' counsel, who stated that he reserved the right to put on character witnesses for the defendants. The further cross-examination of Tom Mourikas was then suspended, and counsel for defendants proceeded to call three witnesses who testified that they were acquainted with the general reputations of all three defendants as honest, law-abiding citizens, and that such reputations were good. On cross-examination, these witnesses stated that they knew nothing about any indictments or convictions of either Tom or Gus Mourikas for receiving stolen goods. Thereupon, Tom Mourikas was recalled, and upon further cross-examination admitted that in the years 1931 and 1933, while he and his brother Gus were in business together in Charleston, they were, in both years, indicted for receiving stolen property, and that he was convicted in both instances, placed on probation and required to make restitution in the first instance and required to serve a sentence in the penitentiary in the second instance. However, Tom Mourikas denied that he was guilty in either instance. Then the Clerk of the Court was called as a witness, and from the record testified that, in 1931, upon his indictment for receiving stolen goods, Tom Mourikas pled guilty to a misdemeanor, was placed on probation for three years, and required to make restitution in the sum of $500. The Clerk further testified that, in 1933, Tom and Gus Mourikas were indicted for receiving stolen goods, that both pled guilty to a felony, that Tom Mourikas was sentenced to one year and six months in the penitentiary, and the case was continued against Gus Mourikas, who was later permitted to withdraw his plea of guilty, and that Gus was not punished on either indictment.

Under the circumstances as set out above, we hardly think that the opening statement of counsel for defendants and the testimony of Gus and Rebecca Mourikas above referred to, were sufficient to place in issue the character of the defendants. However, the crime of receiving stolen goods being one of moral turpitude, we feel no doubt that it was proper to permit the cross-examination of Tom Mourikas as to his convictions for this crime, certainly for the purpose of impeaching his credibility as a witness. "Sec. 981. Cross-examination not Forbidden. The reasons already examined (ante, Sec. 979) appear

plainly to have no effect in forbidding the extraction of the facts of misconduct from the witness himself upon cross-examination. (a) There is no danger of Confusion of Issues, because the matter stops with question and answer; (b) There is no danger of Unfair Surprise, because the impeached witness is not obliged to be ready with other witnesses to answer the extrinsic testimony of the opponent, for there is none to be answered, and because, so far as the witness himself is concerned, he may not unfairly be expected to be ready to know and to answer as to his own deeds. Thus, neither of the reasons has any application, and hence, so far as they are concerned, the opponent is at liberty to bring out the desired facts by cross-examination and answer of the witness himself to be impeached." Wigmore on Evidence, 3d Ed. (Par. 981) 547. See also Davidson v. Watts, 111 Va. 394, 69 S.E. 328; Bell v. Commonwealth, 167 Va. 526, 189 S.E. 441.

 Inasmuch as plaintiff's proof tended to show the commission of a crime by the defendants, and a finding for the plaintiff would really be tantamount to a finding that defendants had committed a crime, it would seem that under the doctrine of Hess v. Marinari, 81 W.Va. 500, 94 S.E. 968, evidence of the character of the defendants would be admissible for all purposes. See also Horton v. Tyree, 1927, 104 W.Va. 238, 139 S.E. 737, 740. Cf. Skidmore v. Star Insurance Co., 126 W.Va. 307, 27 S.E.2d 845. Certainly it would seem that the propriety of the cross-examination of Tom Mourikas as to his previous convictions, was within the sound discretion of the court. State v. Crummit, 123 W.Va. 36, 39, 13 S.E.2d 757.

██ In view of the fact that counsel for the defendants introduced evidence as to the general good character of all three defendants, we hold that the proof of Tom Mourikas' previous convictions of a crime involving moral turpitude was properly admitted in this case for all purposes.

██ As to the evidence of Gus Mourikas' connection with the two offenses of receiving stolen property for which his brother Tom was convicted, it is quite true that the general rule is that proof that one has been previously indicted, and nothing more, is inadmissible, either on cross-examination or as independent testimony. However, the circumstances here were quite unusual, and, we believe, sufficient to constitute an exception to the general rule. It is to be noted that in this action Gus Mourikas was being sued jointly with his wife and brother Tom, and that evidence had been introduced tending to show his complicity in the commission of a crime. At the time he was indicted jointly with his brother Tom in 1933, he and Tom were partners in business, and Tom was convicted on his plea of guilty and sent to the penitentiary. Gus himself voluntarily entered his plea of guilty to this indictment. Even though Gus was later permitted to withdraw his plea of guilty and receive no punishment, we believe that under all the circumstances of this case it was not error to admit the testimony as to the inclusion of Gus in the indictment.

As to the admissibility of evidence, Rule 43 of the Federal Rules of Civil Procedure, in part, is as follows: "All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is here in made."

██ It is quite obvious from the language of this Rule that, in doubtful cases, the doubt should be resolved in favor of the admissibility of the evidence.

It is our conclusion that the facts of this case were peculiarly appropriate for determination by a jury. The record satisfies us that the defendants have had a fair trial in which we find no error. It therefore follows that the judgment of the District Court is

Affirmed.